# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————————

№ 09-CV-4562 (JFB)

————————————————

## GARNER ALLEN,

Petitioner,

VERSUS

## DALE ARTUS, SUPERINTENDENT,

Respondent.

————————————————

**MEMORANDUM AND ORDER**
May 14, 2014

————————————————

JOSEPH F. BIANCO, District Judge:

Garner Allen (hereinafter "Allen" or "petitioner"), petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his conviction for murder in the second degree in a state court. Petitioner challenges his conviction on the following grounds: (1) the prosecution failed to prove beyond a reasonable doubt that petitioner caused the death of the victim, Ruth Seybolt, and the jury verdict was against the weight of the evidence; (2) the police lacked probable cause to arrest petitioner; (3) the trial court erred in failing to suppress petitioner's post-arrest oral admission; (4) the medical examiner's expert testimony that the victim's death was a homicide denied petitioner a fair trial; (5) the trial court improperly admitted a forensic animation of an edited surveillance video into evidence; and (6) petitioner was denied effective assistance of trial counsel.

For the reasons set forth below, the Court determines that the petition for habeas corpus is without merit. Accordingly, the Court denies the petition in its entirety.

## I. BACKGROUND

### A. Facts

The instant petition stems from petitioner's conviction, after a jury trial, of murder in the second degree, *see* N.Y. Penal Law § 125.25(3). The following facts were adduced from the petition and documents attached thereto, as well as from the state court trial and appellate record.

On May 2, 2005, eighty-five year old Ruth Seybolt ("Seybolt") went to a bank and cashed a check for $1,000.00. (T. at 924.)[1] The next day, she went to the Riverhead Public Library and entered the lower level

_____

[1] "T." refers to the trial transcript.

commonly referred to as the "stacks" at approximately 11:26 a.m., wearing a blue coat and carrying her long-strapped pocketbook and a canvas bag. (*Id.* at 95, 374–75, People's Ex. 51.)[2] As described in respondent's papers, a surveillance video admitted in evidence at trial shows that petitioner entered the stacks less than a minute earlier, wearing a dark coat, jeans, and sneakers. (People's Ex. 51.) Video surveillance showed Seybolt moving through the library, while petitioner appears to shadow her movements. (*Id.*)

At approximately 11:58 a.m., Seybolt walked to the far end of a row of bookshelves. (*Id.*) Surveillance camera 12A recorded a person in dark clothing grab Seybolt, leaving her lying on the floor with only her legs visible. (*Id.*) At approximately 11:59 a.m., surveillance camera 1B showed petitioner walking toward the stairs; a thin strap, consistent with the victim's purse, was visibly hanging from his dark jacket. (*Id.*) He moved out of the camera's view between the shelves and emerged carrying his coat tucked under his arm at approximately 12:01 p.m. (*Id.*) Petitioner left the library and walked toward the Riverhead train station; when he reentered the library at approximately 12:07 p.m., he was again wearing his coat. (T. 381–82.)

Deborah Bouchard ("Bouchard"), a homemaker and a registered nurse, arrived at the library with her daughter, who was in a stroller, and took the elevator to the lower level at approximately 12:09 p.m. (*Id.* at 655.) When she left the elevator, she heard a man's voice asking, "Did you fall?" but heard no response. (*Id.* at 657.) Petitioner approached Bouchard, told her that there was a lady lying on the floor, and led Bouchard to the victim. (*Id.* at 658.) Petitioner stated that he thought she had suffered a seizure. (*Id.* at 658.) Bouchard saw a petite, older woman lying motionless on the ground with a tote bag on her arm. (*Id.* at 659, 663.) The victim was lying flat on her back, diagonally across the aisle, with her toes up against the bookshelf and her knees up. (*Id.* at 659.) Bouchard instructed petitioner to ask the librarians to call 911. (*Id.* at 659.) She noted that there was blood coming out of the victim's ear, and that there was a pool of congealed blood next to her head; it appeared that it had been there for a while. (*Id.* at 659.) A portion of the victim's dentures were on the floor next to her. (*Id.* at 660.) Bouchard did not think that the victim had suffered a seizure. (*Id.* at 660–661.) The victim was semi-conscious, "moaning and groaning," and could only tell Bouchard her first name. (*Id.* at 661.) Bouchard did not notice any library carts or stools in the vicinity. (*Id.* at 664.)

Petitioner told Elizabeth Stokes ("Stokes"), a library employee, that a lady downstairs had suffered a seizure. (*Id.* at 145.) Stokes had known petitioner for over ten years. (*Id.* at 126.) When petitioner later spoke with Stokes again, he reiterated that a lady had suffered a seizure in the lower stacks, but seemed nervous and agitated. (*Id.* at 145–46.) Stokes went to the victim and saw that she was sitting up with her back against the wall, bleeding but not speaking. (*Id.* at 172–73.) When Riverhead EMTs responded to the library, they found the victim on her back with lacerations and blood on the right side of her face. (*Id.* at 690–92.) Her lips, cheeks, and right ear were

[2] Exhibit 51, which was admitted in evidence at petitioner's trial, creates a type of timeline sequence of the petitioner's and victim's movements both before and after the crime. It was entered in evidence on September 21, 2006, through the testimony of Daniel Krengiel. It uses highlights of the surveillance video from the Riverhead Public Library on May 3, 2005 (in evidence as Exhibits 27 through 31), coupled with a computer-generated, 3-D floor plan of the lower stacks based upon a map of the Riverhead Library (in evidence as Exhibit 24B). (*See* T. at 1007–09.)

bruised. (*Id.* at 694.) She did not have any injuries on her arms or legs. (*Id.* at 694.) No injuries consistent with a fall were evident on the victim. (*Id.* at 711–12.) The aisle where the victim was found was clear; there were no carts or stools present, and the victim's purse was not found. (*Id.* at 712–14.) The victim did not know where she was; she complained of nausea and kept crying in pain, "my head, my head." (*Id.* at 712.) The library staff located the victim's name and address through their records. (*Id.* at 713.)

Seybolt was transported to Central Suffolk Hospital, where she presented with a laceration on the right ear, abrasions and contusions about her face, and bleeding from the left ear. (*Id.* at 713.) A CT scan at the hospital revealed subarachnoid hemorrhaging. (*Id.* at 936, 939.) There was no indication that the victim had suffered a seizure. (*Id.* at 947.) The victim was later transported to Stony Brook Medical Center, where a second CT scan found that the victim had suffered a contracoup injury requiring a craniotomy. (*Id.* at 939–40.) Her daughter, Betty Fox, and grandson, Robert Fox, a Nassau County police officer, arrived at the hospital and found the victim in the trauma unit; her face was swollen, her cheeks were black and blue, as were her ears, her neck, and her chest. (*Id.* at 83, 862.) The victim could shake her head, but she could not communicate verbally. (*Id.* at 862–63.) The hospital had the victim's coat, glasses, clothing, and car keys, but her purse was missing. (*Id.* at 83–84.). The victim did not recall how she became injured at the library. (*Id.* at 876–77.)

Betty Fox went to her mother's house early the next day, but did not find the victim's pocketbook. (*Id.* at 866.) She discovered that her mother had written a check for "household" for $1,000.00. (*Id.* at 870.) Money from the cashed check was never recovered. (*Id.* at 876–77, 879.) Robert Fox called the Central Suffolk Hospital and learned that his grandmother did not have a pocketbook or any identification when she was admitted. (*Id.* at 85). He also called the library and the Riverhead Town Police, but he could not locate his grandmother's purse. (*Id.* at 86.) He searched her car, her home, the library grounds and nearby dumpsters, as well as the platform area of the Riverhead train station and nearby garbage cans, without finding the purse. (*Id.* at 86–88.) He discovered that the library had surveillance video, and the library director permitted him to view the tapes on May 5, 2005. (*Id.* at 89–90.) Robert Fox discovered that his grandmother had been carrying her purse when she entered the library. (*Id.* at 90, 95.) As Robert Fox followed his grandmother's progress through the library, he noticed that a man in black appeared to be following her. (*Id.* at 94. 96.) At one point, his grandmother abruptly disappeared from the tape; she then apparently was lying on the floor, with only her legs in view of the camera. (*Id.* at 97.) Robert Fox called the Riverhead Town Police, and he and Detective Robert Boden ("Det. Boden") reviewed the tapes together. (*Id.* at 102, 366.)

On May 8, 2005, Police Officer Michael Schmidt of the Riverhead Town Police Department found the victim's pocketbook in the common vestibule area of one of the inoperable cars located at the Riverhead train station. (*Id.* at 766). The doorway to the car was open, and garbage and debris littered the floor. (*Id.* at 772, 776.) No fingerprint evidence was found on the purse. (*Id.* at 828.)

Detective Peter Aragone ("Det. Aragone") of the Suffolk County Police Electronic Investigation Section examined the library surveillance system on May 11, 2005. (*Id.* at 218–19.) The library had two

surveillance systems, A and B, each with four drives. (*Id.* at 220.) Det. Aragone removed the original hard drives from the library and confirmed that the system was operating properly on May 3, 2005. (*Id.* at 220.) Since the cameras in the library were motion-activated, systems A and B were not synchronized; the discrepancy between the cameras was determined to be twenty-five to thirty seconds. (*Id.* at 223, 269–70, 285.) Det. Aragone made exact duplicates, or "clones," of all of the camera surveillance of each system on May 3, 2005 between 11:00 a.m. and 1:00 p.m. (*Id.* at 220–23, 242, 245, 284–86.) He also created photographs from individual frames of the video. (*Id.* at 341–42.)

Daniel Krengiel ("Krengiel"), a computer animation teacher with degrees from New York University and the University of Florida, prepared Exhibit 51 to create a type of timeline sequence of the petitioner's and victim's movements before and after the crime. (*Id.* at 1005–10.) He used highlights of the surveillance tapes from the Riverhead Public Library on May 3, 2005 (in evidence as Exhibits 27–31), coupled with a computer-generated 3-D floor plan of the lower stacks based upon a map of the Riverhead Library (in evidence as Exhibit 24B). (*Id.* at 1007–09.)

On May 26, 2005, Det. Boden observed petitioner riding a bicycle on Hubbard Avenue in Riverhead and stopped him. (*Id.* at 389–90.) Det. Boden said he wanted to speak with petitioner about what had happened at the library. (*Id.* at 390.) Petitioner said he had found "the lady" downstairs and that she was not moving. (*Id.* at 390.) Petitioner claimed the victim told him she was fine and asked him to leave her there on the floor. (Court Ex. 4.) He stated that he had seen a lady who was a nurse, and that she had helped him with the victim. (T. 389–90.) Petitioner said that he frequently borrowed books from the library and, on May 3, he did not leave the library but stepped outside to smoke. (*Id.* at 390.) He thought the victim had suffered a seizure. (*Id.* at 390.) Det. Boden recorded their conversation in writing. (*Id.* at 389–90.)

Pamela Trojanowski ("Trojanowski"), an administrative assistant at the library, ran into petitioner on June 21, 2005. (*Id.* at 843–44.) She had known petitioner since he was a teenager. (*Id.* at 845.). Petitioner told Trojanowski that he had seen the woman downstairs and had called a woman who was pushing a stroller to help her. (*Id.* at 846.) He stated that the victim had mumbled something to him. (*Id.* at 846.) Petitioner did not understand why the detectives were questioning him. (*Id.* at 846–47.)

On July 6, 2005, Det. Boden spoke with petitioner at Riverhead Town Police headquarters. (*Id.* at 419.) He advised petitioner of his *Miranda* rights. (*Id.* at 419–20.) Det. Boden told petitioner that he wanted to speak with him about the incident at the library (*Id.* at 423.) Petitioner said that he really had not found the lady; the woman with the baby had brought him to her. (*Id.* at 423.) Petitioner said the lady had been in really bad shape, and he thought she had suffered a seizure. (*Id.* at 424.) When Det. Boden asked petitioner if he had seen a purse near the victim, petitioner responded that he had seen a white bag. (*Id.* at 424.) Petitioner stated that he had briefly left the library on May 3, 2005, because he went outside to smoke. (*Id.* at 426.) He insisted that he always went to the library and took out books. (*Id.* at 425.) The police had already discovered that petitioner had received a library card on April 28, 2005, but had never checked out any library materials. (*Id.* at 150, 152.)

When Det. Boden and Detective Sergeant Joseph Loggia ("Det. Sgt. Loggia")

showed petitioner a picture taken from the surveillance tape of petitioner in the library on May 3, 2005, with a strap hanging out of his coat, petitioner explained that the strap was from a video camera he often borrowed from his cousin. (*Id.* at 427–29.) Det. Boden told petitioner that it looked like a pocketbook strap. (*Id.* at 429.) Petitioner denied hurting Seybolt. (*Id.* at 430.) Det. Sgt. Loggia placed petitioner under arrest for robbery. (*Id.* at 432.) Petitioner told Det. Boden that he had not hurt the victim, but admitted that he took her purse. (*Id.* at 432–34.) On July 10, 2005, Detective Haley recovered the jacket that petitioner had been wearing on May 3, 2005. (*Id.* at 494.)

After undergoing a craniotomy, the victim suffered several urinary tract infections. (*Id.* at 945.) She required the placement of a catheter into her bladder. (*Id.* at 945.) The urinary tract infections led to other system failures, and the victim developed sepsis, a blood stream infection. (*Id.* at 946.) On August 9, 2005, the victim died of heart failure caused by a complication from her head trauma. (*Id.* at 876, 946–954.) Dr. Gwen Harleman ("Dr. Harleman"), a deputy medical examiner, certified that the manner of death was homicide. (*Id.* at 954.)

B. Procedural History

A Suffolk County grand jury returned an indictment charging petitioner with robbery in the first degree and assault in the first degree. That indictment was subsequently dismissed pursuant to a superseding indictment, No. 2897-05, charging petitioner with two counts of murder in the second degree under New York Penal Law §§ 125.25(2) and 125.25(3). Petitioner entered a plea of not guilty.

Before trial, the judge conducted a *Huntley* suppression hearing on May 9,

2006, to determine the voluntariness of petitioner's statements to the police. (Hr'g 5/9/2006 at 3.[3]) Det. Sgt. Loggia testified that petitioner had been told he was under arrest after the photographs from the library surveillance video had been shown to him, and before he stated that he had taken the victim's purse, at which point he was handcuffed. (*Id.* at 30–33.) Det. Boden testified that petitioner had not been free to leave the police department complaint room during his questioning on July 6, 2005. (*Id.* at 108.) At the conclusion of the testimony, petitioner moved to expand the hearing to include a finding as to whether petitioner had been arrested without probable cause. (*Id.* at 128.)

On August 2, 2006, the court conducted a *Dunaway* hearing to determine whether the police had probable cause to arrest petitioner. After hearing the testimony of Det. Sgt. Loggia and Det. Boden, the court viewed the surveillance videos from the library and still photographs taken from the video tapes, which included a photo of petitioner leaving the library with a strap hanging from his jacket. The court found that there had been probable cause to arrest petitioner in light of "circumstances that places [sic] the victim of the crime . . . in the direct same vicinity as the defendant, coupled with the photos from the surveillance camera of the strap and, immediately thereafter, the change from the coat being on to off." (Hr'g 8/2/2006 at 81.[4]) The court also determined that "the testimony of both witnesses established the voluntariness of those statements beyond a reasonable doubt . . . in that there was probable cause and a knowing, voluntary,

[3] "Hr'g 5/9/2006" refers to the transcript of the Huntley suppression hearing that took place on May 9, 2006.

[4] "Hr'g 8/2/2006" refers to the transcript of the hearing that took place on August 2, 2006.

intelligent waiver of the Miranda warnings." (*Id.* at 84–85).

On September 26, 2006, following a jury trial, petitioner was convicted of murder in the second degree in the County Court for the State of New York, County of Suffolk. (*See* T. at 1259). Petitioner was sentenced to an indefinite prison term of twenty-five years to life (S.[5] at 51).

After his conviction, petitioner filed a motion *pro se* asking the court to set aside his sentence pursuant to New York Criminal Procedure Law § 440.20. (*See* Mot. 10/26/2006.[6]) On January 19, 2007, the court denied the motion, noting that petitioner's claims could be raised on direct appeal of his conviction. (Order 1/19/2007.[7]) Petitioner filed a notice of appeal from his conviction on November 7, 2006.

Petitioner raised the following arguments on direct appeal: (1) the People failed to prove beyond a reasonable doubt that petitioner caused the death of Seybolt, and the jury verdict was against the weight of the evidence; (2) the police did not have probable cause to arrest petitioner, and his post-arrest oral admission should have been suppressed; (3) the medical examiner's expert testimony that the victim's death was a homicide denied petitioner a fair trial; (4) the court erred in admitting the forensic animation of edited surveillance videos (Exhibit 51) in evidence; (5) petitioner was denied effective assistance of counsel; (6) the prosecutor failed to prove petitioner's guilt; and (7) the sentence was excessive.

On July 22, 2008, the Supreme Court of the State of New York, Appellate Division, Second Judicial Department ("Appellate Division"), affirmed petitioner's conviction. *People v. Allen*, 861 N.Y.S.2d 789 (N.Y. App. Div. 2008). The court concluded that the police had probable cause to arrest petitioner, and that the trial court had properly exercised its discretion in admitting petitioner's statements to the police and the forensic animation in evidence. *Id.* at 790. Further, the court held that the verdict was not against the weight of the evidence, that petitioner had been afforded meaningful representation at trial, and that the sentence imposed was not excessive. *Id.* at 791. The court also noted briefly that the issue of the medical examiner's expert testimony had not been properly preserved for appellate review and, "in any event, does not require reversal." *Id.* at 791. Petitioner filed an application for leave to appeal to the New York Court of Appeals, which was denied on October 23, 2008. *People v. Allen*, 11 N.Y.3d 829 (2008).

By petition dated October 19, 2009, petitioner filed for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent submitted a return and memorandum of law in opposition to the petition on January 22, 2010. On January 29, 2010, petitioner requested a stay of the habeas proceedings in order to exhaust the remedies available to him under state law. The court issued a stay on March 4, 2010, to permit petitioner to file his motions in state court, and also granted an extension of time on March 30, 2010.

Petitioner then filed a *pro se* motion pursuant to CPL §440.10, asking the court to vacate his conviction due to ineffective assistance of trial counsel. On October 4, 2010, the court denied the motion, citing the Appellate Division's ruling that petitioner had been afforded meaningful representation at trial as the law of the case.

---

[5] "S" refers to the transcript of petitioner's sentencing.

[6] "Mot 10/26/2006" refers to petitioner's motion made pursuant to § 440.20.

[7] "Order 1/19/2007" refers to the state court's January 19, 2007 decision.

Petitioner also filed a *pro se* application for a writ of error coram nobis to vacate, on the ground of ineffective assistance of appellate counsel, the appellate court's decision affirming his conviction. On October 26, 2010, the Appellate Division denied petitioner's application. *People v. Allen*, 909 N.Y.S.2d 398 (N.Y. App. Div. 2010). The Court of Appeals denied leave to appeal this decision on March 2, 2011. *People v. Allen*, 16 N.Y.3d 827 (2011).

The Court has fully considered all of the submissions and arguments of the parties.

## II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "'Clearly established Federal law'" is "'comprised of "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). Additionally, while "'[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)).

Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact . . . are reviewed *de novo.*'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

## III. DISCUSSION

### A. Procedural Bar

As a threshold matter, respondent argues that some of petitioner's claims are procedurally barred from habeas review. Specifically, respondent contends that the claim regarding the medical examiner's testimony is unpreserved, and that the sufficiency of the evidence claim is partially unpreserved. The Court agrees.

#### 1. Legal Standard

A petitioner's federal claims may be procedurally barred from habeas review if they were decided at the state level on "independent and adequate" state procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729–33 (1991); *see, e.g.*, *Michigan v. Long*, 463 U.S. 1032, 1041 (1983). The procedural rule at issue is adequate if it is "firmly established and regularly followed by the state in question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (internal quotation marks omitted). To be independent, the "state court must actually have relied on the procedural bar as an independent basis for its disposition of the case," by "clearly and expressly stat[ing] that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255, 261–63 (1989) (internal quotation marks omitted). In addition, a state court's reliance on an independent and adequate procedural bar precludes habeas review even if the state court also rejected the claim on the merits in the alternative. *See, e.g.*, *Harris*, 489 U.S. at 264 n.10 (holding that "a state court need not fear reaching the merits of a federal claim in an *alternative* holding," so long as the state court "explicitly invokes a state procedural bar rule as a separate basis for decision" (emphasis in original)); *Glenn v. Bartlett*, 98 F.3d 721, 725 (2d Cir. 1996) (same).

If a habeas court determines that a claim is procedurally barred, then the court may not review the claim on the merits unless petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *See Coleman*, 501 U.S. at 750. A miscarriage of justice is demonstrated in extraordinary cases, such as where a constitutional violation results in the conviction of an individual who is actually innocent. *Murray v. Carrier*, 477 U.S. 478, 496 (1986). To overcome procedural default based on a miscarriage of justice, the petitioner must demonstrate that, "in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt'" and would require "'new reliable evidence . . . that was not presented at trial.'" *House v. Bell*, 547 U.S. 518, 537 (2006) (quoting *Schlup v. Delo*, 513 U.S. 324, 327 (1995)).

#### 2. Application

##### a. Sufficiency of the Evidence Claim

Petitioner claims that there was insufficient evidence to support a finding of guilt beyond a reasonable doubt on the charge of murder in the second degree. Specifically, petitioner argues that the People failed to prove beyond a reasonable doubt that petitioner caused the death of Seybolt. He also contends that the evidence

was insufficient because there were no witnesses to the crime, and the victim had been unable to identify her attacker before her death due to the severity of her injuries.

At the conclusion of the trial, defense counsel asserted generally that the prosecution had not proven petitioner's guilt beyond a reasonable doubt, and that the prosecution had failed to show that Dr. Harleman had actually performed an autopsy of the victim's body. The specific arguments raised in petitioner's appellate brief, such as petitioner's assertion that his conduct was not a direct cause of the victim's death, were never mentioned at trial.

On appeal, petitioner argued that the evidence was legally insufficient as to the elements of identification and causation. The Appellate Division held that "only the former [identification element] is preserved for appellate review." *Allen*, 861 N.Y.S.2d at 790 (internal citations omitted). The court also stated, "In any event, viewing the evidence in the light most favorable to the prosecution, we find that [the evidence] was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." *Id.* at 620 (internal citations omitted).

In the instant case, petitioner has neither provided a satisfactory explanation for his failure to raise the sufficiency of the evidence claim regarding proof of causation in state court, nor has he demonstrated prejudice resulting therefrom or a miscarriage of justice. The evidence presented at trial clearly established petitioner's guilt beyond a reasonable doubt. Accordingly, the sufficiency of the evidence claim is partially barred from review by this Court (namely, as to the sufficiency of the evidence of causation). In any event, the claim is without merit, as set forth *infra*.

b. Medical Examiner's Testimony

Petitioner claims that he was denied a fair trial when the state court allowed the prosecution to elicit improper testimony from Dr. Harleman that went beyond the permissible scope of an expert opinion. Specifically, petitioner contends that Dr. Harleman's testimony indicated her belief in petitioner's guilt, in that she cited the police investigation as a basis for her conclusion that the manner of the victim's death was homicide.

Despite his arguments, petitioner acknowledged in his appellate brief that he failed to object to the medical examiner's testimony at trial. (*See* Appellant's Brief at 25–26.) When he raised the issue on appeal, petitioner argued that the court should have nonetheless addressed the claim in the interest of justice. Respondent countered that the court should have declined to review the unpreserved claim because of the overwhelming evidence of petitioner's guilt. (Appellee's Brief at 42.) The Appellate Division concluded that the issue was unpreserved and ruled that, "in any event, [the issue] does not require reversal." *Allen*, 861 N.Y.S.2d at 791.

Here, petitioner has neither provided a satisfactory explanation for his failure to object to Dr. Harleman's testimony at trial, nor has he demonstrated prejudice resulting therefrom or a miscarriage of justice. As noted *supra*, the evidence presented at trial clearly established petitioner's guilt beyond a reasonable doubt. Accordingly, the claim regarding the medical examiner's testimony is procedurally barred from review by this Court. In any event, the claim is without merit, as set forth *infra*.

## B. Merits

### 1. Sufficiency of the Evidence

Petitioner claims that there was insufficient evidence to support a finding of guilt beyond a reasonable doubt on the charge of murder in the second degree. Specifically, petitioner argues that the prosecution failed to prove beyond a reasonable doubt that petitioner caused the death of Seybolt. He further contends that the jury verdict was against the weight of the evidence.

Where a state court has adjudicated a claim of legal insufficiency on the merits, habeas relief may be granted if "it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). Under the deferential AEDPA standard of review discussed *supra*, the sole inquiry on federal habeas review is whether the state court unreasonably applied the governing standard for legal insufficiency claims set forth in *Jackson v. Virginia*. *See Policano v. Herbert*, 507 F.3d 111, 115–16 (2d Cir. 2007). Under that standard, a reviewing court must consider the evidence in the light "most favorable to the prosecution," *Einaugler v. Supreme Court of State of N.Y.*, 109 F.3d 836, 839–40 (2d Cir. 1997), and the conviction must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). "[A] petitioner bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficiency of the evidence." *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000).

In considering the sufficiency of the evidence supporting a state court conviction, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999) (citations omitted). Accordingly, in the instant case, this Court looks to New York law for the elements of murder in the second degree. "In New York State, an individual may be guilty of murder in the second degree where '[a]cting either alone or with one or more other persons, he commits or attempts to commit [an enumerated felony], and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, *causes* the death of a person other than one of the participants." *Howard v. Walker*, 406 F.3d 114, 125 (2d Cir. 2005) (quoting N.Y. Penal Law § 125.25(3) (2004)) (emphasis and alterations in original).

Viewing the facts in the light most favorable to the state, it is clear that the prosecution put forth sufficient evidence from which a reasonable juror could find petitioner guilty of murder in the second degree beyond a reasonable doubt. Specifically, Krengiel prepared Exhibit 51 in order to create a type of timeline sequence of the petitioner's and victim's movements leading up to the crime and just afterward. (T. at 1005–10.) He used highlights of the surveillance tapes from the Riverhead Public Library on May 3, 2005, coupled with a computer-generated 3-D floor plan of the lower stacks based upon a map of the Riverhead Library. (*Id.* at 1007–09.) The surveillance video showed petitioner shadowing victim's movements through the library shortly before the incident, and a thin strap, consistent with the victim's missing purse, protruding from his jacket shortly after the incident. (People's Ex. 51.) Shortly after displaying the strap, petitioner removed his jacket and briefly left the library walking

towards the Riverhead Train Station, where the purse was later found. (*Id.*)

Bouchard testified that petitioner had told her there was a lady lying on the floor, and that he thought she had had a seizure. (T. 655–59.) She found petitioner lying flat on his back with a pool of congealed blood next to her head; she did not notice any library carts or stools in the vicinity that might have indicated a fall. (*Id.* at 664.) When EMTs responded to the library, they found no injuries on the victim's arms or legs, or any other injuries consistent with a fall. (*Id.* at 690–92, 694.) A CT scan at the hospital revealed subarachnoid hemorrhaging; there was no indication that the victim had suffered a seizure. (*Id.* at 936, 939, 947.) After undergoing a craniotomy, the victim suffered several urinary tract infections. (*Id.* at 945.) She required the placement of a catheter into her bladder. (*Id.* at 945.) The urinary tract infections led to other system failures and the victim developed sepsis, a blood stream infection. (*Id.* at 946.) On August 9, 2005, the victim died of heart failure due to a complication from her head trauma. (*Id.* at 876, 946–54.) Dr. Harleman certified that the manner of death was homicide. (*Id.* at 954.)

Det. Boden testified about his interview with petitioner on July 6, 2005. Petitioner waived his *Miranda* rights and stated that he had not found "the lady;" a woman brought him to her, and he thought she had had a seizure. He stated that he had not seen a purse near the victim, and told Det. Boden that he had briefly left the library to smoke. (*Id.* at 419–20, 423–26.) When the police showed him a photo from the surveillance video showing the strap hanging from his jacket, petitioner claimed that it was the strap of a video camera he often borrowed from his cousin. (*Id.* at 422, 427, 429–30.) After petitioner was placed under arrest for robbery, however, he admitted that he had taken the victim's purse. (*Id.* at 432–34.)

It is clear that the jury in this case credited the prosecution's witnesses and gave the evidence the full weight that it could reasonably be accorded. As to petitioner's causation claim, the prosecution proved that his conduct forged a link in the chain of causes which brought about the victim's death. *People v. Stewart*, 40 N.Y.2d 692, 697 (1976). In other words, the prosecution demonstrated that petitioner's "actions [were] a sufficiently direct cause of the ensuing death" so that criminal liability could be imposed. *People v. Kibbe*, 35 N.Y.2d 407, 413 (1974). Contrary to his contention, the victim's pre-existing bladder stones did not free petitioner from liability for her death because "death resulting from a felonious assault is not relieved by such contributing factors as a victim's pre-existing health condition." *People v. Bowie*, 607 N.Y.S.2d 248, 249 (N.Y. App. Div. 1994).

On direct appeal, the Appellate Division held that the issue of causation had not been properly preserved for review and ruled that "in any event, viewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." *Allen*, 861 N.Y.S.2d at 790 (internal citations omitted). This Court finds no basis to conclude otherwise. The prosecution put forth overwhelming evidence of petitioner's guilt, including evidence of causation. Accordingly, petitioner's insufficient evidence claim fails on the merits, and his request for habeas relief on that ground is denied.[8]

---

[8] Moreover, petitioner's claim that the verdict was against the weight of the evidence asserts only an error of state law, which is not a basis for federal

### 2. Probable Cause to Arrest

Petitioner argues that he is entitled to habeas relief because the police lacked probable cause to arrest him. The Court disagrees. As set forth below, the Court cannot grant relief on this ground because the petitioner had a full and fair opportunity to litigate this Fourth Amendment claim in state court. In any event, even if the Court could review the underlying merits of this Fourth Amendment claim, petitioner's claim fails because petitioner has not demonstrated that the state court ruling was contrary to, or involved an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence in the record.

It is well-settled that, "[w]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). The Second Circuit has further explained that, under *Powell*, "review of fourth amendment claims in habeas petitions would be undertaken in only one of two instances: (a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the

state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992) (citing *Gates v. Henderson*, 568 F.2d 830, 839 (2d Cir. 1977) (en banc)). Courts have held that such a breakdown occurs when the state court "failed to conduct a reasoned method of inquiry into the relevant questions of fact and law." *Capellan*, 975 F.2d at 71 (citations and quotations omitted).

With respect to the existence of corrective procedures, it is clear that New York has adequate corrective procedures, which are set forth in New York Criminal Procedure Law § 710.10 *et seq.* for litigating Fourth Amendment claims. *See, e.g.*, *Capellan*, 975 F.2d at 70 n.1 ("[T]he 'federal courts have approved New York's procedure for litigating Fourth Amendment claims . . . as being facially adequate.'" (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989))). Moreover, in the instant case, there is absolutely no evidence of an unconscionable breakdown in the underlying process. To the contrary, after petitioner filed his motion to suppress, the court conducted a pre-trial *Dunaway* hearing. After the hearing, the court found that the police had probable cause to arrest petitioner and held that the resulting evidence from his arrest would be admissible at trial. In addition to the lower court proceedings, petitioner also raised his Fourth Amendment claims on appeal to the Appellate Division, which affirmed the lower court rulings. Thus, the record reveals no "'disruption or obstruction of a state proceeding' typifying an unconscionable breakdown," *Capellan*, 975 F.2d at 70 (quoting *Shaw v. Scully*, 654 F. Supp. 859, 864 (S.D.N.Y. 1987)); rather, the record clearly establishes that the state courts conducted a reasoned and thorough method

---

habeas review. *See, e.g.*, *McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011) (summary order) ("[T]he argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus, and as a matter of federal constitutional law a jury's verdict may only be overturned if the evidence is insufficient to permit any rational juror to find guilt beyond a reasonable doubt."). However, even construed as a sufficiency of the evidence claim, it is without merit as discussed *supra*.

of inquiry into the relevant facts. In short, having fully availed himself of New York's corrective procedures regarding his Fourth Amendment claim, petitioner has had an opportunity for full and fair litigation of the claim and may not raise it on federal habeas review. *See, e.g., Garret v. Smith*, No. 05-CV-3374 (JFB), 2006 WL 2265094, at *8 (E.D.N.Y. Aug. 8, 2006).

In any event, even if this Court could review this claim, the claim is without merit. The state court had more than a sufficient basis to find probable cause to arrest petitioner. Under the Fourth Amendment, a warrantless arrest is constitutionally valid if the arresting officers had probable cause to make the arrest at the time of the arrest. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Probable cause exists "if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990) (citing *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949)). Similarly, New York requires a police officer to have reasonable cause before making a warrantless arrest. *See* N.Y. Crim. Proc. Law § 140.10. New York's "reasonable cause" standard has substantially the same meaning as probable cause under the Fourth Amendment. *Wu v. City of New York*, 934 F. Supp. 581, 586 n.1 (S.D.N.Y. 1996); *see also United States v. Fisher*, 702 F.2d 372, 375 n.6 (2d Cir. 1983). Reasonable cause exists "when evidence or information which appears reliable discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such offense was committed and that such

person committed it." N.Y. Crim. Proc. Law § 70.10(2).

Here, the trial court cited three factors that together gave Detective Sergeant Loggia probable cause to arrest petitioner: (1) petitioner's geographic and temporal proximity to the incident; (2) the depiction on the surveillance video of a strap protruding from petitioner's jacket just after the incident; and (3) the fact that, shortly after displaying the strap, petitioner removed his jacket. (Hr'g 8/2/2006 at 81.) The testimony of the detectives and the surveillance videos from the library provided enough evidence to establish probable cause to believe that petitioner had committed robbery.

In short, there is nothing in the record to indicate that the state court's ruling that the police had probable cause to arrest petitioner was contrary to, or an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented at the state court hearing. Accordingly, even if this Court could review petitioner's Fourth Amendment claim on the merits, the Court concludes that the claim lacks merit.

### 3. Admission of Petitioner's Statements to Police

Petitioner argues that the trial court's failure to suppress his statements to the police denied him his right to a fair trial. In support of this claim, petitioner seems to rely on his contention that the statements were uttered after the police arrested him without probable cause. (Pet. at 7.) As discussed *supra*, that claim is without merit. However, the Court liberally construes petitioner's claim as a challenge to the determinations made in the *Huntley* hearing, namely that petitioner waived his *Miranda*

rights and that the statements he made in response to police questioning were voluntary and therefore admissible. (Hr'g 8/2/2006 at 82–86.) After an extensive review of the record, the Court concludes that the trial court's determination of petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim does not provide a basis for habeas relief.

### a. Factual Determinations

The following facts were adduced at the pre-trial *Huntley* hearing. On July 6, 2005, Det. Sgt. Loggia requested that petitioner go to the Riverhead Town Police headquarters to speak with Det. Boden about the incident at the library.[9] (Hr'g 5/9/2006 at 12.) Petitioner agreed, and Det. Sgt. Loggia walked with him to the police station and asked him to wait in the complaint room. (*Id.* at 12–13.) Det. Boden arrived shortly thereafter and read petitioner his *Miranda* rights from a standard police department statement form at approximately 9:50 a.m. (*Id.* at 69–70.) Petitioner said that he understood his rights and would talk to Det. Boden, but he refused to sign anything. (*Id.* at 73–75.) Petitioner said that he really did not find the victim; the woman with the baby brought him to her. (*Id.* at 76.) Petitioner said that the victim was in really bad shape, and he thought she had suffered a seizure. (*Id.* at 76.) When Det. Boden asked petitioner if he had seen a purse near the victim, petitioner responded that he saw a white bag. (*Id.* at 77.) Petitioner stated that he had briefly left the library on May 3,

---

[9] Petitioner was appearing in court that day on an unrelated matter. Upon learning of his presence, Det. Sgt. Loggia found him in the hallway outside the courtroom and spoke to him there. (Hr'g 5/9/2006 at 11–12.)

2005, because he went outside to smoke. (*Id.* at 80.) He insisted that he always went to the library and took out books. (*Id.* at 79.) When Det. Boden and Det. Sgt. Loggia showed petitioner a picture taken from the surveillance tape of petitioner in the library on May 3, 2005, with a strap hanging out of his coat, petitioner explained that the strap was from a video camera that he often borrowed from his cousin. (*Id.* at 81.) Det. Sgt. Loggia told petitioner that it looked like a pocketbook strap. (*Id.* at 25.) Petitioner denied hurting the victim. (*Id.* at 82.) Det. Sgt. Loggia showed petitioner a photograph of the victim in the hospital and told him that he needed to inform the police of any other circumstances surrounding what had happened to her, or a jury would see the photo and think he had deliberately beaten and robbed her. (*Id.* at 30–32.) Petitioner said he was not like that and that he had a grandmother. (*Id.* at 32.)

Det. Sgt. Loggia placed petitioner under arrest for robbery at approximately 11:00 a.m. and handcuffed him to a chain anchored to the floor. (*Id.* at 33.) Petitioner told Det. Boden that he did not hurt the victim, but he had found her lying on the floor and took her purse. (*Id.* at 85.) Det. Boden read petitioner his *Miranda* rights again, and petitioner again agreed to waive his rights and repeated his statement about taking the victim's pocketbook. (*Id.* at 86–88.) Then petitioner refused to sign the written statement, and the interview concluded. (*Id.* at 91.)

The court found that petitioner "did make a knowing, voluntary, intelligent waiver of his rights." (Hg'r 8/2/2006 at 86.) Further, the court found that "the testimony of both witnesses established the voluntariness of those statements beyond a reasonable doubt." (*Id.* at 84.)

### b. Voluntariness of Petitioner's Waiver of *Miranda* Rights

First, the Court examines whether there was sufficient evidence for the state court to have concluded that petitioner voluntarily waived his *Miranda* rights.

The Fifth Amendment of the United States Constitution provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Recognizing that a custodial interrogation creates "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," the Supreme Court held in *Miranda v. Arizona* that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444, 467 (1966). "In particular, prior to the initiation of questioning, [law enforcement] must fully apprise the suspect of the State's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present . . . if [he] so desires.'" *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (quoting *Miranda*, 384 U.S. at 468–70) (alteration in original). However, when an individual in custody knowingly and voluntarily waives his *Miranda* rights, law enforcement officers may question that individual until he clearly requests an attorney or invokes his right to remain silent. *See, e.g.*, *Davis v. United States*, 512 U.S. 452, 470–71 (1994). A *Miranda* waiver may be implied from the circumstances, and where a defendant indicates that he understands his rights, does not request counsel, and proceeds to answer an officer's questions, such circumstances

support the conclusion that *Miranda* was waived. *See, e.g.*, *North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (rejecting rule that explicit statement of waiver is necessary to support a finding that a defendant waived his right to remain silent or right to counsel guaranteed by *Miranda*).

Here, petitioner's refusal to sign the *Miranda* form is insufficient, on its own, to conclude that petitioner did not voluntarily waive his rights. *Oliveira v. Phillips*, No. 05-CV-564 (SAS), 2007 WL 2890211, at *10 (S.D.N.Y. Sept. 28, 2007) ("[A] criminal defendant's refusal to sign a *Miranda* card does not, without more, constitute an invocation of his right to remain silent." (citing, *inter alia*, *United States v. Spencer*, 995 F.2d 10, 12 (2d Cir. 1993))); *United States v. Plugh*, 522 F. Supp. 2d 481, 493 (W.D.N.Y. 2007) (holding that a "defendant's refusal to sign a waiver form is not dispositive of the issue of waiver" (citing, *inter alia*, *United States v. Boston*, 508 F.2d 1171, 1175 (2d Cir. 1974))). Moreover, it is clear that Det. Boden read petitioner his *Miranda* rights both before and after his arrest. In both instances, petitioner indicated that he understood his rights and agreed to speak to police without requesting a lawyer. (Hr'g 8/2/2006 at 69–75.) Thus, the Appellate Division reasonably concluded that the trial court properly found a *Miranda* waiver under the evidence presented at the *Huntley* hearing. That conclusion is in accord with clearly-established Supreme Court precedent, and the Court finds no reason to disturb the state court's determination that petitioner voluntarily waived his *Miranda* rights.

### c. Voluntariness of Petitioner's Statements

Next, the Court examines whether there was insufficient evidence for the state court to have concluded that petitioner's

statements in response to police questioning were voluntary and, therefore, admissible at trial.

The "ultimate issue of voluntariness [of a confession] is a legal question requiring independent federal determination." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991)); *see also Nova v. Bartlett*, 211 F.3d 705, 707 (2d Cir. 2000); *Mincey v. Arizona*, 437 U.S. 385, 398 (1978) (holding that the Court is not bound by a state court's determination that a statement was voluntary; instead, the Court is under a duty to make an independent evaluation of the record). "'No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances.'" *Nelson*, 121 F.3d at 833 (quoting *Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988)). Factors to be considered include the accused's experience and education; the conditions of the interrogation; and the conduct of law enforcement official—notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics. *Id.* (citing *Green*, 850 F.2d at 901). "Subsidiary questions, such as the length and circumstances of an interrogation, or whether the police engaged in the intimidation tactics alleged by the defendant, are entitled to the presumption of correctness." *Id.* (internal citation and quotation marks omitted); *see also Towndrow v. Kelly*, No. 98-CV-0509 (DNH)(GLS), 2000 WL 33743385, at *4 (N.D.N.Y. Dec. 20, 2000).

In this case, there is no basis to conclude that the statements were made involuntarily. In viewing the totality of the circumstances, neither the conditions of the interrogation nor the conduct of the police support petitioner's assertion that his statements were involuntary. The state court credited the following testimony of the officers: (1) petitioner was read his *Miranda* rights and indicated to police that he understood them; (2) petitioner agreed to speak with the police, and he did not ask for the interview to end or to speak to counsel; and (3) no one threatened petitioner or made promises to induce him to answer questions. Petitioner has failed to provide any evidence to undermine the findings of the state court. Accordingly, the Court concludes that the Appellate Division's denial of petitioner's claim that his statements to police should have been suppressed was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim does not provide a basis for habeas relief.

### 4. Medical Examiner's Testimony

Petitioner claims that he was denied a fair trial when the state court allowed the prosecution to elicit testimony from medical examiner Dr. Harleman that went beyond the permissible scope of expert opinion. Specifically, petitioner contends that Dr. Harleman's testimony indicated her belief in petitioner's guilt, in that she cited the police investigation as a basis for her conclusion that the manner of the victim's death was homicide. The Appellate Division found the issue unpreserved and ruled that "in any event, [the issue] does not require reversal." *Allen*, 861 N.Y.S.2d at 791. Therefore, the claim is procedurally barred. Moreover, as set forth *infra*, there is no basis to conclude that the trial court's evidentiary ruling was erroneous under either state or federal law, and there is certainly no showing that the ruling, even if erroneous, rose to a constitutional level that deprived petitioner

of a fair trial. Thus, this claim does not warrant habeas relief.

It is well-settled that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983); *see also Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("[H]abeas corpus relief does not lie for errors of state law." (citations omitted)). Instead, for a habeas petitioner to prevail in connection with a claim regarding an evidentiary error, the petitioner must "show that the error deprived her of a fundamentally fair trial." *Taylor*, 708 F.2d at 891; *see also Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004) ("Even erroneous evidentiary rulings warrant a writ of habeas corpus only where the petitioner 'can show that the error deprived [him] of a fundamentally fair trial.'" (quoting *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir. 1988) (internal quotation marks omitted))). In other words, "[t]he introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal quotation marks omitted)). To constitute a denial of due process under this standard, the erroneously admitted evidence must have been "'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Dunnigan*, 137 F.3d at 125 (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992)); *see also Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) (holding that evidence must be "crucial, critical, highly significant") (internal quotation marks omitted). Moreover, the court "must review the erroneously admitted evidence 'in light of

the entire record before the jury.'" *Dunnigan*, 137 F.3d at 125 (quoting *Johnson v. Ross*, 955 F.2d at 181 (internal quotation marks omitted)). In making this due process determination, the Court should engage in a two-part analysis, examining (1) whether the trial court's evidentiary ruling was erroneous under New York State law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial. *Wade v. Mantello*, 333 F.3d 51, 59 (2d Cir. 2003); *Davis v. Strack*, 270 F.3d 111, 123–24 (2d Cir. 2001).

As set forth below, the Court has reviewed the trial court evidentiary ruling to which petitioner objects, and concludes that petitioner's claim lacks merit. As a threshold matter, there is no basis to conclude that the trial court's admission of the testimony regarding the manner of the victim's death was erroneous under state law. The trial court has the discretion to decide whether expert testimony is needed to help jurors understand the evidence and reach a determination of the facts of the case. *People v. Brown*, 97 N.Y.2d 500, 505 (2002); *People v. Barnes*, 604 N.Y.S.2d 218, 219 (N.Y. App. Div. 1993). The Court of Appeals has warned courts against excluding expert testimony merely because, to some degree, it invades the jury's province. *See generally People v. Cronin*, 60 N.Y.2d 430 (1983). To a certain extent, that invasion is necessary "since the expert—and not the jury—draws conclusions from the facts, which the jury is then asked to adopt." *Id.* at 432. Nevertheless, expert testimony "is admissible where the conclusions to be drawn from the facts 'depend upon professional or scientific knowledge or skill not within the range of ordinary training or intelligence.'" *Id.* at 432 (quoting *Dougherty v Milliken*, 163 N.Y. 527, 533 (1900)); *see also People v. Jones*, 73 N.Y.2d 427, 430 (1989).

Expert medical testimony is admissible if (1) medical knowledge is sufficiently developed so as to permit a reasonable opinion of an expert in the field; (2) the expert's opinion testimony relies upon medical knowledge or skill not within the ordinary training or intelligence of the average juror; and (3) the expert testimony is relevant. *People v. Wernick*, 89 N.Y.2d 111, 115–16 (1996). Factors that may have caused a victim's death are not necessarily within the purview of the average juror, and may require expert testimony. *See People v. Lee*, 96 N.Y.2d 157, 162 (2001); *People v. Albizu*, 743 N.Y.S.2d 74, 75 (N.Y. App. Div. 2002).

Here, Dr. Harleman's testimony as to the cause of the victim's death was properly admitted in evidence under New York law. Dr. Harleman testified that she performed an autopsy on the victim and reviewed the victim's medical records from May 3 to August 9, 2005. (T. at 935–39) The CT scans showed bruising to the brain with progressive subarachnoid bleeding and a skull fracture on the left side of the back of her head, requiring a craniotomy. (*Id.* at 935–42.) Although the victim improved after surgery, she developed several urinary tract infections. She was particularly prone to these due to a pre-existing kidney condition. (*Id.* at 945.) The urinary tract infections led to sepsis, which triggered other system failures and ultimately led to heart failure. (*Id.* at 950–52.) Dr. Harleman testified to a reasonable degree of medical certainty that the proximate cause of the victim's death was her head trauma. (*Id.* at 953.)

Dr. Harleman further testified that she found no evidence that the victim suffered from an aneurysm, stroke, heart attack, seizure, or any other natural malady (*Id.* at 941, 943, 947.) She explained that, if the victim had suffered a seizure, it was highly unlikely that she would have fallen backwards as the victim did. In addition, if someone had naturally fallen backwards, the evidence of injury would be at the point of impact without the lacerations to other areas of the face and head that the victim suffered. (*Id.* at 948–49.) The testimony regarding the victim's injuries and the cause of her death was clearly outside the knowledge of the average juror. It was also highly relevant in this case; the prosecution had to prove causation as an element in order to establish petitioner's guilt beyond a reasonable doubt, while petitioner's own statements pointed to a seizure as an alternate cause of the victim's injuries, one that might have helped create reasonable doubt.

Petitioner contends that Dr. Harleman's testimony went beyond the permissible scope of expert testimony in her conclusion that the manner of the victim's death was homicide. At trial, she stated, "The cause of death as I said was the head trauma. The manner of death—this is based on the autopsy, the neuropathology examination, review of all the medical records, past medical history, the police investigation—I certified the manner of death as homicide." (*Id.* at 953–54.) In forming an opinion, an expert "'may rely on material, albeit of out-of-court origin, if it is of a kind accepted in the profession as reliable in forming a professional opinion' or if it 'comes from a witness subject to full cross-examination on the trial.'" *People v. Goldstein*, 6 N.Y.3d 119, 124–25 (2005) (quoting *People v. Sugden*, 35 N.Y.2d 453, 461 (1974)). Here, defense counsel had a full and fair opportunity to cross-examine the witness. In fact, counsel brought out Dr. Harleman's admission that "she could only speculate as to whether the lethal infections would have developed but for the head injury." (T. at 961.) In addition, the witness' reference to the victim's medical records and the police investigation are materials accepted by the

medical community to help form an opinion. *People v. Odell*, 808 N.Y.S.2d 830, 833 (N.Y. App. Div. 2006). That evidence may serve as a link in the chain of data which led to the expert opinion. *People v. Wlasiuk*, 821 N.Y.S.2d 285, 292 (N.Y. App. Div. 2006).

When the court admits such evidence, it should instruct the jury on how to evaluate expert testimony. *Brown*, 97 N.Y.2d at 500; *People v. Rincon*, 732 N.Y.S.2d 160, 160 (N.Y. App. Div. 2001). Here the court told the jury that they alone were to evaluate the evidence. (T. at 1190.) The court also instructed the jurors that they should evaluate the medical expert testimony the same way they evaluated that of any other witness, and noted that they were free to accept or reject it. (*Id.* at 1209–11.)

Finally, even if the admission of the testimony regarding the manner of the victim's death was erroneous under state law, there is no basis for the Court to conclude that the admission of that testimony deprived petitioner of his constitutional right to a fair trial. Petitioner argues that the jury could infer from Dr. Harleman's testimony that she was of the opinion that petitioner had murdered the victim. However, there is no evidence in the record to support that contention, since the medical examiner never gave an opinion on petitioner's guilt or innocence. Moreover, Dr. Harleman's statement that the manner of death was homicide was not a legal characterization, but a medical opinion indicating that the head trauma was not from natural causes. *Odell*, 808 N.Y.S.2d at 833. Even if such a statement were impermissible, it amounted to harmless error because the evidence of petitioner's guilt was overwhelming in this case based upon, among other things, the evidence discussed *supra* in connection with the petitioner's sufficiency claim. *See, e.g.*, *People v. Crimmins*, 36 N.Y.2d 230, 242 (1975).

Furthermore, the medical examiner's testimony characterizing the manner of death as a homicide constituted only a small part of the prosecution's case, which was comprised of surveillance footage, testimony from library workers and patrons, and petitioner's admissions, as well as medical records and the autopsy report. In other words, in light of the entire record, there is nothing about the admission of this evidence, even if it were erroneous, that rendered petitioner's trial unfair.

In sum, the state court's ruling admitting in evidence the testimony as to the manner of the victim's death was neither contrary to, nor an unreasonable application of, clearly established federal law. Thus, petitioner's request for a writ of habeas corpus based upon the state court's evidentiary ruling is denied.

### 5. Improper Admission of Edited Surveillance Video

Petitioner further contends that the trial court erred when it permitted Exhibit 51, a computer-generated forensic animation of the library surveillance video, in evidence. He argues that Exhibit 51 "interpreted and expressed opinions about the content of the surveillance videos, thus invading the exclusive province of the jury to weigh the evidence and determine the facts." (Pet. at 10). For the reasons set forth below, the Court finds that there is no basis to conclude that the admission of Exhibit 51 constituted an evidentiary error that deprived petitioner of a fair trial.

Under New York law, for computer-generated evidence to be admissible, it is important that it be "relevant to a possible defense, that it fairly and accurately reflect the oral testimony offered and that it be an aid to the jury's understanding of the issue." *People v. McHugh*, 476 N.Y.S.2d 721, 723

(N.Y. Sup. Ct. 1984); *see People v. Demetsenare*, 787 N.Y.S.2d 515, 518 (N.Y. App. Div. 2005). In general, demonstrative evidence is admissible, in the court's discretion, provided that the conditions under which the demonstration is conducted are similar to those existing at the time of the incident at issue. It is well-established that "[a] variation in circumstances affects the weight of the evidence, but is not a basis for its exclusion." *People v. Mariner*, 538 N.Y.S.2d 61, 62 (N.Y. App. Div. 1989) (internal citations omitted). The test for admissibility of computer-edited demonstrative evidence remains the same as that for traditional exhibits. *See, e.g.*, *McHugh*, 476 N.Y.S.2d at 722 ("Whether a diagram is hand-drawn or mechanically drawn by a computer is of no importance."). As long as the prosecution properly authenticates the animation and establishes that the probative value of the animation outweighs the danger of unfair prejudice, computer-generated animation is admissible. *People v. Yates*, 736 N.Y.S.2d 798, 801 (N.Y. App. Div. 2002). It is within the court's discretion as to whether a computer-edited video may be admitted as demonstrative evidence for the purpose of helping a jury understand a concept. *Kane v. Triborough Bridge & Tunnel Auth.*, 777 N.Y.S.2d 686, 687 (N.Y. App. Div. 2004); *Yates*, 736 N.Y.S.2d at 801. Finally, the Court must instruct the jury that the computer-generated animation is "being admitted for the limited purpose of illustrating the expert's opinion . . . and that it was not to consider the computer-generated animation itself in determining what actually [happened] . . . . Without such a limiting instruction, the trial court [leaves] open the possibility that the jury might confuse art with reality." *Kane*, 777 N.Y.S.2d at 55.

In this case, Krengiel, a computer animation teacher with degrees from New York University and the University of Florida, prepared Exhibit 51 to create a type of timeline sequence of the petitioner's and victim's movements leading up to and after the crime. (*Id.* at 1005–10.) He used highlights of the surveillance tapes from the Riverhead Public Library on May 3, 2005 (in evidence as Exhibits 27 through 31), coupled with a computer-generated 3-D floor plan of the lower stacks based upon a map of the Riverhead Library (in evidence as Exhibit 24B). (*See id.* at 1007–09.) Krengiel explained how he used standard animation software known as "Maya" to make the video. That particular computer program uses a two-dimensional floor plan and builds a 3-D model. With this technology, Exhibit 51 showed where the cameras were located on the lower stacks of the library, and where the cameras pointed at a specified time period.

The floor plan of the library was authenticated through the testimony of Stokes, a library employee. (*Id.* at 130.) Similarly, the operability of the surveillance cameras and authentication of the Riverhead Library surveillance tapes used by Krengiel were proven through the testimony of Det. Aragone (T. 218–328, T. 9/12/06 P.M. 2–23), Elizabeth Stokes (T. 126–52), Det. Boden (*id.* at 365–89), and Krengiel (*id.* at 1008–09). The footage was edited by Krengiel and the trial prosecutors, but at no time were any of the original tapes changed (*Id.* at 1014–22). Since the exhibit was only minimally edited and drew no conclusions about any of the victim's or petitioner's movements outside the range of the cameras, the danger of unfair prejudice to petitioner is very slight. By contrast, Exhibit 51 had high probative value for the jury due to the complex nature of the library's surveillance system. The Riverhead Library has two video surveillance systems, A and B, each with four drives. Since the cameras were motion-activated, systems A and B

were not synchronized, leaving a twenty-five to thirty second time lapse between cameras. The exhibit thus helped jurors visualize the relative movements of the victim and petitioner through the library more accurately.

Finally, before the video was played, the court instructed the jury to decide for themselves the accuracy of the presentation and the weight it would be afforded (*Id.* at 1021.) The judge repeated this instruction before the jury began their deliberations: "This exhibit purports to depict various locations and events and objects relevant to the issues in the case. The presentation was received into evidence to assist you in making your evaluation of the testimony relating to the locations, you are the sole judges of the accuracy of this presentation so you are the sole judges of the weight to be given to this presentation." (*Id.* at 1192–93).

The computer-edited video, therefore, was properly admitted into evidence. *See In re Sept. 11 Litig.*, No. 21-MC-97 (AKH), 2007 WL 2668608, at *3 (S.D.N.Y. September 12, 2007). Even if improperly admitted, there is no basis to conclude that the admission of Exhibit 51 deprived petitioner of a fair trial. In sum, the state court's evidentiary ruling with respect to Exhibit 51 was neither contrary to, nor an unreasonable application of, clearly established federal law. Thus, petitioner is not entitled to habeas relief on the basis of this claim.

### 6. Ineffective Assistance of Counsel

Petitioner further contends that he received ineffective assistance of counsel because counsel failed to argue lack of causation in his motion for dismissal pursuant to New York Criminal Procedure

Law § 290.10.[10] For the reasons set forth below, the Court discerns no basis to

---

[10] This claim differs somewhat from the ineffective assistance of counsel claims petitioner raised on direct appeal and through his § 440.10 motion. On direct appeal, petitioner raised an additional argument that counsel's failure to object to the testimony of the medical examiner constituted ineffective assistance of counsel. Though he does not make that argument in the instant petition, the Court would have rejected such a claim on the merits. "There are strategic reasons an attorney might 'forego objections: the conclusion that additional objections might have annoyed the judge or jury; the possibility that the prosecutor, given enough rope, would alienate the jury; the desire not to call attention to unfavorable evidence or to highlight unfavorable inferences.'" *Hudgins v. People of N.Y.*, No. 07-CV-01862 (JFB), 2009 WL 1703266, at *13 (E.D.N.Y. June 18, 2009) (quoting *Taylor v. Fischer*, No. 05-CV-3034 (GEL), 2006 WL 416372, at *5 (S.D.N.Y. Feb. 21, 2006)). During the trial, defense counsel did make objections in several instances, which indicates that the choice not to object at other times "was driven by strategy." *Hudgins*, WL 1703266 at *13 (quoting *Nova v. Ercole*, No. 06-CV-562 (NRB), 2007 WL 1280635 at *8 (S.D.N.Y. Apr. 30, 2007)). Moreover, as discussed *supra*, the admission of the testimony was proper. Counsel's failure to make a meritless argument cannot amount to ineffective assistance of counsel under the federal standard. *United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999).

In his § 440.10 motion, petitioner argued that his lawyer's failure to secure a medical expert to rebut the evidence offered by the prosecution's witness constituted ineffective assistance of counsel. The trial court denied the motion, finding that the state appellate court's determination of "meaningful representation" was binding on the trial court as the law of the case. (Order 1/19/2007 at 4). The trial court also noted that it would have denied the motion on the merits, because defense counsel's strategy of focusing on the insufficiencies of the prosecution's case constituted meaningful representation under the New York standard. (*Id.* at 5.) The Supreme Court dismissed a similar claim in *Harrington v. Richter*. *See* 131 S. Ct. 770, 788 (2011). In *Harrington*, the state court had determined that defense counsel's failure to consult blood evidence experts in developing a defense strategy to a murder prosecution or to offer their testimony at trial was not deficient performance. *Id.* at 789–90. The Supreme Court held that the state court's holding was not an

conclude that petitioner's counsel was constitutionally defective, or that there was any prejudice to petitioner.

Under the standard set forth in *Strickland v. Washington*, petitioner is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). This Court examines each prong in turn, keeping in mind that the habeas petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004). As set forth below, petitioner's claim fails to satisfy either element.

a. Counsel's Representation of Petitioner Was Objectively Reasonable

The first prong of *Strickland* requires a showing that counsel's performance was deficient. However, "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and

'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a "'fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.'" *Id.* (quoting *Rompilla v. Beard*, 545 U.S. 374, 408 (2005)). In assessing performance, a court "must apply a 'heavy measure of deference to counsel's judgments.'" *Id.* (quoting *Strickland*, 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision," and "'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *DeLuca v. Lord*, 77 F.3d 578, 588 & n.3 (2d Cir. 1996) (quoting *Strickland*, 466 U.S. at 690–91). "However, 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 690–91).

Under this standard, the record supports the Appellate Division's conclusion that petitioner received effective representation. *See Allen*, 861 N.Y.S.2d at 791. Petitioner's trial counsel made numerous pretrial motions, including a request for the dismissal of the indictment for legal sufficiency of the evidence presented to the grand jury, and motions for *Huntley*, *Sandoval*, and *Dunaway* hearings. At trial, counsel thoroughly cross-examined witnesses and made numerous objections. He challenged the admissibility of several

---

unreasonable application of *Strickland*, and thus did not warrant federal habeas relief. *Id.* "Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Id.* at 789. Here, counsel reasonably could have decided to forgo inquiry into the medical evidence, given that such inquiry may have exposed petitioner's version of events as an invention. Further, counsel might have reasonably concluded that calling an expert witness for the defense would have other risks; such testimony could "shift attention to esoteric matters of forensic science, distract the jury from whether [the defendant] was telling the truth, or transform the case into a battle of the experts." *Id.* at 790. Therefore, even if petitioner had repeated this allegation in the instant petition, the court would have rejected such a claim on the merits.

pieces of evidence for failure to lay a proper foundation and argued that other evidence was repetitive of items already in evidence. He argued that the computer-generated animation was based on items already in evidence and was distorted and confusing. As to the jury's use of a transcript of an audiotape, counsel requested that the court give the jury limiting instructions regarding its use. Counsel moved for a trial order of dismissal pursuant to New York Criminal Procedure Law §§ 290.10 and 330.30, and for a mistrial based on prosecutorial misconduct. The record proves that petitioner received his constitutional right to effective assistance of counsel. *See, e.g.*, *Williams v. Ercole*, No. 05-CV-4242, 2009 WL 3837307 at *6 (E.D.N.Y. Nov. 17, 2009).

As to the contention that counsel should have argued that the prosecution failed to prove that petitioner caused the victim's death, this argument is without merit. Defense counsel's failure to make a baseless challenge could not amount to ineffective assistance of counsel. *See, e.g.*, *Love v. Smith*, No. 08-CV-3746 (BMC), 2009 WL 2422384 at *7 (E.D.N.Y. Aug. 6, 2009). Given the evidence in the case, it was entirely reasonable to pursue a defense based on an identification theory, rather than focus on a very weak causation argument. Regardless of counsel's rationale, the Court finds that his representation of petitioner was objectively reasonable and thus fails to satisfy the first prong of the *Strickland* standard.

b. Petitioner Has Failed to Demonstrate Prejudice by Counsel's Deficiency

Even assuming *arguendo* that petitioner could show that counsel's performance was deficient, the Court concludes that petitioner cannot show that he was prejudiced by such deficiency. The second prong focuses on prejudice to a petitioner. A petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that they 'undermine[] confidence in the outcome.'" *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). "'[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilty.'" *Henry v. Poole*, 409 F.3d 48, 63–64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695). "'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of *Strickland*, the determination of prejudice may be made with the benefit of hindsight." *Hemstreet v. Greiner*, 491 F. 3d 84, 91 (2d Cir. 2007) (internal citation and quotation marks omitted).

Under this standard, the Court concludes that counsel's failure to argue causation did not prejudice petitioner or deprive petitioner of a fair trial. The evidence of petitioner's guilt was overwhelming and, therefore, there is no reason to believe that the jury would have reached a different verdict absent the alleged deficiency. *See, e.g.*, *Butts v. Walker*, No. 01-CV-5914(JG), 2003 WL 22670921, at *8 (E.D.N.Y. Nov. 6, 2003). Accordingly, petitioner cannot satisfy the second prong of *Strickland*.

Petitioner has thus failed to sustain his burden to show that he received ineffective assistance of counsel. Petitioner's representation by trial counsel fell within the wide range of reasonable professional assistance, and petitioner has not demonstrated that the state court's denial of this claim was contrary to clearly established federal law. *Morgan*, 2009 WL 3805309, at *5–7.

In sum, the ineffective assistance of counsel claim fails on the merits and, thus, does not provide a basis for habeas relief.

### IV. CONCLUSION

For the reasons set forth herein, this Court finds that petitioner has demonstrated no basis for habeas relief under 28 U.S.C. § 2254. Petitioner's claims are plainly without merit. Therefore, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
Joseph F. Bianco
United States District Judge

Dated: May 14, 2014
        Central Islip, New York

*   *   *

Petitioner proceeds *pro se*. Respondent is represented by Thomas Spota, District Attorney of Suffolk County, by Karla L. Lato, 200 Center Drive, Riverhead, NY 11901.